## In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.

### No. Bky 70–432.

United States District Court,
E. D. Pennsylvania.

Nov. 17, 1977.

Duane, Morris & Heckscher by William R. Traub, Philadelphia, Pa., for the trustee, Lehigh Valley R. Co.

Ballard, Spahr, Andrews & Ingersoll by James D. Coleman, Philadelphia, Pa., for Girard Trust Bank, Fidelity Bank, and Chemical Bank.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., Shearman & Sterling by Matthew Gruskin, New York City, for First Nat. City Bank of New York.

Kelley, Drye, Warren, Clark, Carr & Ellis by Edward Roberts, III, New York City, for Manufacturers Hanover Trust Co. as mortgage trustee, Lehigh Valley Terminal R. Co.

Pelino, Wasserstrom, Chucas & Monteverde by Michael A. Bloom, Philadelphia, Pa., for Pennsylvania Co. and Harold Scattergood, Sr., Harold Scattergood, Jr., and Jane Scattergood, petitioners for leave to intervene specially.

## MEMORANDUM

FULLAM, District Judge.

On March 26, 1976, five days before the date on which most of the Debtor's railroad was conveyed to ConRail, as required by the Regional Rail Reorganization Act of 1973 (hereinafter "RRRA"), Citibank, as Inden-

ture Trustee of the Lehigh Valley Harbor Terminal Railway Company First Mortgage Indenture filed a petition seeking sequestration of the rental income from the Claremont Terminal, the principal asset securing the mortgage. The petition also sought to require the Lehigh Valley Trustee to pay real estate taxes on the property. A hearing was held on April 26, 1976. On June 2, 1976, this Court's Order No. 362 was entered, denying the petition. Although no opinion was filed, the Order recited this Court's conclusion "that granting the relief requested would impermissibly interfere with the formulation and implementation of a plan of reorganization for the Debtor's estate."

Citibank appealed. In the course of the further proceedings, the Court of Appeals, of its own motion, directed the parties to brief additional issues, concerning perceived uncertainties as to whether it was legally permissible for a railroad debtor affected by the RRRA to reorganize under § 77 of the Bankruptcy Act, following the mandatory conveyance to ConRail. In its Opinion, 558 F.2d 137, filed June 3, 1977, the Court of Appeals concluded that § 77 did indeed still apply. However, the Court reiterated its view that income from mortgaged property may be used to support reorganization efforts only if certain specified conditions are met. The Court viewed the shorthand, cryptic, recital in Order No. 362 as not necessarily being equivalent to the required findings (*i. e.*, that the Trustee needs to use this income, and cannot obtain the money elsewhere; and that detriment to the interests of the secured creditor is unlikely). Accordingly, the Court of Appeals vacated Order No. 362, and remanded the matter for further proceedings.

On July 2, 1977, the Lehigh Valley Trustee filed a Proposed Plan of Reorganization. A principal area of controversy surrounding the proposed Plan concerned claims in excess of $46 million, asserted by the Penn Central Trustees as a claim of administration (representing unpaid interline balances accruing during reorganization). The Court has recently been advised that the parties have reached agreement on a proposed compromise settlement of these issues, and the Lehigh Valley Trustee will shortly be filing an Amended Plan of Reorganization reflecting the proposed compromise.

In mid-October 1977, Citibank filed a "Notice of Renewal" of its pending sequestration petition; on October 28, 1977, the Lehigh Valley Trustee was directed to file an answer to the renewed petition.

The Claremont Terminal produces rentals at the rate of approximately $350,000 annually. That sum represents approximately 76% of all of the rental income enjoyed by the Trustee. This does not mean, of course, that the Claremont Terminal rentals have borne 76% of the expenses of administration during reorganization. Neither is there any basis for assuming that the mortgaged property represents 76% of the value of the assets remaining under the control of the Lehigh Valley Trustee after the conveyance to ConRail. Nevertheless, the 76% figure strongly suggests that, at least since the conveyance on April 1, 1976, the property securing the Lehigh Valley Harbor Terminal Railway Company First Mortgage has been bearing more than its share of the expenses of administration.

It is also very clear, however, that the hearings on the Plan of Reorganization are the appropriate mechanism for exploring these alleged inequities, and making the necessary adjustments. No one has suggested a feasible way of terminating the ongoing expenses of administration, either in pursuit of an acceptable Plan of Reorganization, or in furtherance of some other form of orderly disposition of available assets. No one has suggested, or seriously could suggest, that litigation of the Valuation Case should be abandoned. In short, the first condition mentioned by the Court of Appeals (need for the money) is amply satisfied.

It is also clear that the Debtor has no unencumbered income, or other unencumbered assets, which might be looked to as a source of payment of these ongoing expenses.

The present petition is an inadequate vehicle for achieving the proper allocation of administration expenses. A fair and equitable allocation of these expenses must, of course, be made, either in a Plan of Reorganization, or in a liquidation process. Principles of marshalling must be applied in either context.

■ Therefore, I have no difficulty in concluding that denial of the sequestration petition would not adversely affect the rights represented by Citibank as Indenture Trustee. Those rights can be fully vindicated in the Plan proceedings. There is a surface appeal to the argument that, if the rentals were to be escrowed, and if the Indenture Trustee could establish that the Lehigh Valley Trustee has no equity in the property, and therefore that the property should be disclaimed to the Indenture Trustee, the escrowed rents, as well as the real estate, would then be turned over to the Trustee toward the satisfaction of the mortgage. The same analysis could be made with respect to many other assets of the Debtor. But the overall issue is not whether the security of a particular creditor has been eroded by reason of the mandated continuation of loss rail operations, and the implementation of the RRRA, but how best to allocate those adverse consequences among all of the interests affected. As things now stand, no secured pre-bankruptcy creditor can realistically expect to be able to liquidate the security and walk away with the cash. Accrued unpaid administration expenses, principally consisting of the Government's § 211(h) claims and the claims of state and local taxing entities, must be dealt with. By the same token, all creditors, not just those looking to conveyed rail assets for security, have a stake in the Valuation Case, where erosion issues will be decided.

■ In short, although it is not possible to make a finding that the security of petitioner's mortgage is not affected by the Trustee's use of the Claremont Terminal rentals to meet current expenses of administration, I am satisfied that any such temporary impairment can be rectified in connection with the Plan proceedings, and that those proceedings represent the preferable forum for achieving fairness to all of the creditors.

The petition will therefore be denied, without prejudice.